IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Alan Bruhn and Calvin Bruhn,

Plaintiffs,

v.

United States Department of Agriculture

Defendant.

Case No. 06-258 C

Complaint

FILED
MAR 30 2006
U.S. COURT OF FEDERAL CLAIMS

Case Summary

1. Alan Bruhn and his son, Calvin Bruhn, are Mapleton, Iowa, row crop farmers. They farm approximately 11,000 acres under lease in Woodbury, Monona and Crawford counties. USDA and its employees have been working vigorously to run them out of business through arbitrary and discriminatory application of fictitious conservation standards designed to deny benefits to the Bruhns, otherwise allowed pursuant to the *Farm Security and Rural Investment Act of 2002* (Farm Bill).

2. The Bruhns have been subjected to violations of contractual and constitutional rights by USDA and its agencies: the Commodity Credit Corporation (CCC), the Farm Service Agency (FSA) and the Natural Resources Conservation Service (NRCS). These agencies singled out the Bruhns, breached their contract, treated them differently from others, and wrongfully caused Plaintiffs to lose their federal farm program benefits in 2004. Without Farm Bill benefits, most U.S. farmers cannot financially survive, because bank lenders depart them and commodity prices are below breakeven prices. The Bruhns are no different, and are now threatened with bankruptcy because of USDA's intentional, reckless and wrongful actions.

3. The Bruhns request judgment for them on contractual, Equal Protection and Due Process grounds.

## Jurisdiction

4. This Court has jurisdiction under 28 *USC* § 1491 because Plaintiffs assert claims against the United States founded upon the Constitution, acts of Congress, regulations of the U.S. Department of Agriculture, and express or implied contracts with the United States Department of Agriculture.

## Parties

5. Alan and Calvin Bruhn, father and son, are residents of Mapleton, Iowa. They raise corn and soybeans on land leased from others.

6. The United States Department of Agriculture (USDA) is an agency of the United States created and generally charged with functions defined at 7 *USC* § 202.

## USDA Agencies

7. The Commodity Credit Corporation (CCC) is a federally-owned and operated corporation within USDA created to stabilize, support, and protect agricultural prices and farm income through loans, purchases, payments, and other operations. Corn and soybean farmers are subjected to certain USDA rules by signing a contract with the CCC to receive Farm Program benefits.

8. The Farm Services Agency (FSA) carries out many Farm Bill responsibilities including Farm Credit, Farm Programs, Commodity Operations, Management and State Operations.

9. The Natural Resources Conservation Service (NRCS) is the USDA agency responsible for developing national soil and water programs in cooperation with landowners, operators and others. It is formerly known as the Soil Conservation Service.. NRCS carries out soil conservation compliance reviews on land under Farm Bill program contracts.

## Important Non-Parties

10. Jerry Sindt is the Woodbury County, Iowa District Conservationist employed by USDA-NRCS. His office is located at 206 First Street, PO Box 725, Sergeant Bluff, Iowa 51054.

11. Kathy Schneider is the Monona County, Iowa District Conservationist employed by USDA-NRCS. Her office is located at 22859 Filbert Avenue, PO Box 118, Onawa, Iowa 51040.

12. Michael Musel is an employee of the Iowa Farm Services Agency State office. His address is 10500 Buena Vista Court, Des Moines, Iowa 50322.

13. Susan J. Badding is the Monona County, Iowa FSA Executive Director. Her address is 2631 Iowa Avenue, PO Box 118, Onawa, Iowa 51040. Ms. Badding signed the Bruhn Direct and Counter-Cyclical Program Contract for the CCC.

14. Derryl McLaren is the FSA Iowa State Executive Director. His address is 10500 Buena Vista Court, Des Moines, Iowa 50322.

15. Jon Awtry is an FSA District Director. His office address is 2519 Southwest Avenue, PO Box 284, Harlan, Iowa 51537.

16. Richard Van Klaveren is the NRCS Iowa State Conservationist. His office address is 693 Federal Building, 210 Walnut, Des Moines, Iowa 50309.

17. Astor Boozer is NRCS Assistant State Conservationist for Field Operations.

**Farm Operational History**

18. Alan Bruhn has been farming since 1987, and is the primary manager of the Bruhn farm operation. His son, Calvin, has joined in the farming operation since the year 2000. The Bruhns are recognized among soil conservationists as accomplished in soil erosion prevention on their fields in the Loess Hills of Western Iowa.

19. Representatives from Iowa State University's National Soil Tilth Laboratory and other university Agronomy Departments have toured the Bruhn farm to view Alan Bruhn's exemplary soil erosion control methods. Expert agronomists say they have seen no better conservation practices.

20. Mr. Bruhn uses modern techniques to effectively halt soil erosion on his land. He plants high populations of corn plants per acre, up to 36,000 plants per acre instead of the standard plant population, 30,000 plants per acre. He applies high

fertilization rates to cause the crops to grow healthy with much plant material and corn kernels in each acre. Mr. Bruhn uses a no-till approach to plant his crops. This means that he never cultivates the soil with moldboard plows, chisel plows or other tillage instruments except under extenuating circumstances.

21. Tillage elimination keeps the soil in place; provides dense prior year plant residue soil coverage from corn stalks and leaves; and thus rain and wind have little direct soil contact to cause erosion. Similar landscapes in the area are treated with less care than the Bruhn farms often resulting in erosion, gullying, and low land soil deposition.

22. Traditional soil erosion control methods include terracing steep slopes, planting on the contour (planting roughly perpendicular to downward field slopes), and planting grass waterways to slow downhill water travel. These older and classical methods of soil erosion control are recognized as far less effective than the Bruhns' high population, high fertility, high residue no till approach. Terracing, contouring and grass waterways stops or slows water carrying soil after it has traveled some distance downhill.

23. The comprehensive Bruhn method stops soil erosion from starting. This is because rain drops are deflected by plant residue cover before hitting the soil, residual root systems hold the soil, and thus water cannot carry soil away. Thus, water-born soil erosion momentum never begins and terraces and waterways become irrelevant, though the Bruhns use these traditional methods also.

24. Throughout the 1990s, Alan Bruhn was found in compliance with all conservation-related requirements to receive U.S. Farm Program benefits. Mr. Bruhn farmed with the same high population, high fertility, no till methods in the 1990s as in the present decade. Indeed, before the USDA campaign described here began, Neil Stockfleth, former Woodbury County NRCS District Conservationist said "Alan, you are doing great, keep doing what you are doing" with regard to soil conservation.

## Contracts, Statutes and Regulations

25. The Bruhns were subjected to USDA regulations and cropland oversight via contract. Farmers have no obligation to comply with USDA conservation regulations unless they participate in the Farm Bill program to receive loans and payments from the government. Most producers, including the Bruhns, agree to subject themselves to Farm Bill rules relating to soil conservation and other matters to receive Farm Bill benefits.

26. Alan Bruhn entered into Farm Bill contracts with the CCC for the 2002, 2003 and 2004 crop years. He did so for himself, his son Calvin and his then-wife Sheryl.

27. The Bruhns also agreed to allow representatives of the CCC to enter his land to determine compliance. NRCS representatives carry out this soil conservation compliance monitoring function in practice for the CCC.

28. Soil conservation compliance monitoring sometimes includes a Conservation Plan designed by NRCS and the farmer.

29. The contracts obliged the Bruhns to comply with USDA regulations including the Highly Erodible Land (HEL) provisions of the Farm Bill and underlying regulations. 16 USC § 3811 et seq.; 7 CFR Part 12.

30. These are the relevant rules:

30.1. Farmers shall not be found Farm Bill program ineligible for failure to actively apply a Conservation Plan if they acted in good faith and without intent to violate the HEL rules. 16 USC § 3812(f)(1); 7 CFR 12.4.

30.2. Farmers shall not be found Farm Bill program ineligible for failure to actively apply a Conservation Plan if the violation is (a) technical and minor; (b) due to circumstances beyond the control of the farmer; or (c) a variance is granted by the USDA. 16 USC § 3812(f)(4).

30.3. The USDA must provide the farmer Conservation Plan options which are cost effective while meeting soil erosion goals. 16 USC § 3812(g).

30.4. The Conservation Plan standards must be: (a) technically and economically feasible; (b) based upon local resource conditions and available conservation technology; (c) cost effective; and (d) must not cause undue economic hardship to the farmer. 16 USC § 3812a(a).

30.5. Farmers may self-certify compliance with the HEL provisions. 16 USC § 3812a(d).

30.6. If HEL is newly included in an existing field, the entire field will not be subjected to the higher standard. *National Food Security Act Manual(NFSA Manual)* § 512.02.

30.7. If HEL fields are converted from native vegetation after 1985, no substantial increase in erosion is allowed. *NFSA Manual* § 512.01.

30.8. If HEL fields have a crop history, a substantial reduction in soil erosion must occur. *NFSA Manual* § 512.01.

31. Susan Badding of the Monona County FSA signed the contracts for the USDA's CCC.

32. The USDA's CCC agreed to provide Farm Bill benefits including these: Direct Payments, Counter Cyclical Payments, Disaster Payments, Loan Deficiency Payments, Soybean Sealing loans.

**Facts Relating to USDA Wrongdoing**

33. In 2000, Alan Bruhn leased land owned by Robert Peterson, the late chief executive officer of meat packing giant, IBP, inc. Mr. Bruhn caused some of this land to be transformed from pasture to crop production. Local and state Farm Service Agency and Natural Resource Conservation Service officials were subjectively dismayed this land was being farmed. USDA and its staff engaged in a comprehensive campaign to

harshly treat Alan and Calvin Bruhn in the form of unfair farm program conservation compliance reviews and investigations based solely upon antipathy to the Bruhns. This campaign started in 2000 and continued five (5) years.

34. From 1987 to 2000, the Bruhn conservation methods were acceptable and praised by NRCS and others. In 2002 and 2003, the same Bruhn consistent conservation methods were deemed non-compliant by the USDA. NRCS staff Kathy Schneider, Jerry Sindt and Astor Boozer required the Bruhns to install impractical, expensive, and ineffective practices such as excessively large waterways, and constant corn crops year after year.

35. The excessively stringent Conservation Plan exceeded that allowed by the Farm Bill and regulations incorporated into the contract signed by the Bruhns. NRCS then found the Bruhns non-compliant with the Conservation Plan in both the 2002 and 2003 crop years. The Bruhn's were deemed non-compliant temporarily, but ultimately persuaded USDA to allow them to receive most Farm Bill benefits. These actions constituted a contract breach by USDA.

36. The non-compliance findings occurred despite prior assurances by local NRCS and FSA staff that Mr. Bruhn was complying with his contract, following the Conservation Plan he signed, and continuing to engage in proper conservation practices. These assurances were contract noncompliant and part of a willful campaign to halt the Bruhns from farming some of their land.

37. Then-NRCS Iowa State Conservationist, Dr. LeRoy Brown acknowledged NRCS wrongdoing in an August 19, 2003 letter stating:

> Statements over time have been made by NRCS staff which would have led Mr. Bruhn to conclude he was doing what is required.
>
> Continue what you are doing (conservation practices) and if any erosion problems occur, they can be fixed at that time.
>
> When in the field building waterways, if there is no erosion on the site, don't bother to construct a waterway or you can make them narrowed to fit the erosion problem.

> When asked if waterways had to be to specified dimensions, the response was 'within reason'.

38. Mr. Brown, in the same letter, directed NRCS staff in this way:

> It must be clear that a conservation plan including practice designs for the tracts is to be developed assigned by October 1, 2003 [for the 2004 planting season] . . . . The plan is not to require more ephemeral erosion control than other similar landscapes in the vicinity of the tracts, and treatment requirements should be similar for similar landscapes and farming systems on all farms associated with Mr. Bruhn.
>
> When planting ephemeral erosion control, be sure all options (water and sediment control bases, grass waterways, critical area seedings, etc.) are presented to Mr. Bruhn. Once decisions are made, be clear on locations and dimensions to be built and/or seeded.

39. NRCS did not heed Mr. Brown's directives or comply with the rules. They continued harassing the Bruhns, singling them out for unfair treatment, and applying arbitrary rules to them without rational basis. These same standards were not applied to farmers cultivating similar landscapes in the area. When Mr. Bruhn told NRCS staff they cannot apply discriminatorily high standards to him, Defendant Sindt responded "Yes we can, you're high profile."

40. On December 16, 2003, Mr. Bruhn signed his 2004 crop year contract with USDA. (Exhibit 1). In March 2004, NRCS imposed a Conservation Plan on certain Bruhn fields in Woodbury and Monona counties that contained standards not allowed or required under the Farm Bill, the regulations or NRCS policies.

41. This Conservation Plan was created by NRCS for Mr. Bruhn using fictitiously high Super Sod Bust and other discriminatory standards for waterways and terraces. Kathy Schneider and Woodbury County District Conservationist Jerry Sindt led Mr. Bruhn to believe the standards were higher for land taken from pasture to no-till corn under his circumstances. But there were no Super Sod Bust standards in existence. This was a arbitrary creation of NRCS and FSA designed to set the Bruhns up for noncompliance findings and loss of farm program benefits.

42. NRCS forced Mr. Bruhn tried to work with Monona and Woodbury County District Conservationists Kathy Schneider and Jerry Sindt, respectively, to become compliant under the so-called Super Sod Bust standards, but both refused stating "it is out of our control." This was one set of many statements indicating the USDA campaign to target the Bruhns. Similar fields with similar landscapes farmed by others in the area, were not held to the same arbitrary standards. The similarly situated fields had higher soil erosion, less stringent conservation practices, were found compliant with USDA conservation rules.

43. On or about May 25, 2004, NRCS singled out the Bruhn farm for a so-called Compliance Review to determine non-compliance with the Conservation Plan. NRCS had a contractual duty of good faith to apply proper standards in assessing the land. But NRCS used improper standards to make their determination. These actions were intentionally and recklessly discriminatory in relation to NRCS standards imposed upon other farmers similarly situated.

44. On June 1, 2004, NRCS Monona County District Conservationist Kathy Schneider notified the Bruhns they were not "actively applying a conservation plan." The non-compliance finding occurred in both Woodbury and Monona Counties.

45. These were the allegations asserted by NRCS to drive the Bruhns out of the farm program:

45.1. Estimated soil loss was 9.3 tons per acre instead of the allowable 4 tons per acre.

45.2. Lack of waterways that NRCS specifically told Mr. Bruhn were not needed.

45.3. Farming over terraces, which were older than anyone could remember and not part of the regulatory framework.

46. Mr. Bruhn tried to work with Monona and Woodbury County District Conservationists Kathy Schneider and Jerry Sindt, respectively, to become compliant under the so-called Super Sod Bust standards, but both refused stating "it is out of our control." Similar fields with similar landscapes, but less meticulous conservation

practices, and higher actual soil erosion in the area were found compliant because USDA had not targeted those farmers in an arbitrary and intentional discrimination campaign.

47. Alan Bruhn requested reconsideration, but NRCS reiterated the non-compliance finding in a July 28, 2004 letter. Mr. Bruhn was also found non-compliant by Woodbury County NRCS.

48. The Bruhns had the right to seek a county-level FSA finding, they were acting in good faith and without intent to violate the HEL rules. The Woodbury County FSA Committee found good faith.

49. Plaintiff believes, but does not know, the Woodbury County FSA Committee "good faith" finding documents subsequently disappeared. Plaintiff believes this disappearance resulted from intentional hiding or destroying these documents. Plaintiff sought these documents in the following months, but FSA and NRCS failed and refused to provide them to the Bruhns or their agents.

50. But the Monona County FSA Committee, which was part of the USDA discrimination campaign against the Bruhns, denied a good faith finding on August 12, 2004 based upon the very same factual considerations as Woodbury County found good faith.

51. A very small portion of the Bruhn land was actually within the arbitrary Super Sod Bust rules created by NRCS – less than one percent (1%) of 11,000 acres. But FSA breached the contract by denying all Farm Bill benefits to the Bruhns for 2004. These Farm Bill program benefits were denied: direct and counter-cyclical program benefits, soybean sealing program benefits, loan deficiency program benefits and disaster payment benefits.

52. On September 23, 2004, the Bruhns requested reconsideration of the Monona County FSA Committee denial. But the FSA County Committee, including Susan Badding, was participating in the campaign to target the Bruhns. Ms. Badding is a member of, and effectively leads, the Monona County FSA Committee, which denied this appeal wrongfully. The denial was due to in large part to Ms. Badding's leadership.

Other committee members are local farmers without detailed knowledge of USDA regulations.

53. The Bruhns were dissuaded from applying for certain farm program benefits, including Loan Deficiency Payment and Soybean Sealing programs, by Susan Badding in the Fall of 2004. Ms. Badding cited the Conservation Plan noncompliance as the reason.

54. The Bruhns requested reconsideration of the FSA refusal to make a "good faith" finding. The Monona County FSA Committee again stated its refusal to do so in a November 2004 meeting.

55. The Bruhns then appealed to the Iowa State Farm Services Agency Committee. They had a right to do this under USDA procedures.

56. The Bruhns participated in mediation with FSA staff including Mike Musel. This mediation was an option the Bruhns were offered under standard USDA procedures. During this mediation, Mr. Musel indicated he would not fairly and objectively consider this appeal. Mr. Musel stated that when he found the Robert Peterson land was going to be farmed by Alan Bruhn, "it came into my office and across my desk that that ground should never be farmed."

57. Mediation was unsuccessful, and the Bruhns proceeded with their appeal.

58. On March 29, 2005, the Iowa State FSA Committee denied the Bruhns' appeal. During the public hearing on this appeal, Mr. Musel and state FSA staff members were laughing and mouthing words disrespectfully to State Committee members during the argument. The State Committee members refused to pay attention and exhibited closed minds because they had previously decided to deny the Bruhns' appeal in prior non-public discussions. The State Committee did so deny the appeal.

59. The Bruhns requested a State FSA Committee reconsideration. The reconsideration occurred, but yet another denial of benefits resulted on July 25, 2005.

60. The Bruhns appealed the State FSA Committee decision to the National Appeals Division of USDA. The Bruhns sought reversal of the non-compliance

finding and/or a determination they acted in good faith and without an intent to violate HEL rules.

61. The National Appeals Division hearing officer agreed with the Bruhns. NAD found the NRCS wrongly determined excessive soil erosion. The hearing officer also found the Farm Service Agency was wrong in denying Mr. Bruhn a "good faith" exemption. This determination issued November 23, 2005. During the hearing, USDA officials put on no witnesses to defend its position, because no witnesses could defend its position. The decision shook USDA's subagencies, FSA and NRCS. But the Hearing Officer did not order a reimbursement amount.

62. Thereafter, the Iowa State Conservationist Richard Van Klaveren of USDA's Natural Resources Conservation Service wrote a December 14, 2005 and December 28, 2005 letter to Mr. Bruhn admitting NRCS and FSA staff incorrectly denied farm program benefits to the Bruhns. NRCS issued a "post-mortem" variance to the Bruhn farm, eighteen months after the non-compliance finding.

63. The economic damage to the Bruhn farm operation was substantial and may be economically fatal. Mr. Bruhn is unable to pay his bills, has been deserted by his bank and may be forced out of farming. Mr. Bruhn fought the weather, the markets and the crop pests since 1987 to build his operation from zero to 11,000 acres and several employees. Fighting the government's targeted and discriminatory campaign has been far more damaging. USDA's willful, arbitrary and discriminatory actions have nearly bankrupted the Bruhns.

**First Claim: Breach of Contract**

64. The farm program contracts for the 2002, 2003 and 2004 crop years bound the Bruhns and USDA. The Bruhns agreed to follow conservation plan requirements in return for USDA providing farm program benefits. These benefits included direct and counter-cyclical payments, disaster payments, and loan deficiency payments.

65. USDA was obliged to apply the same conservation standards to the Bruhns, as were applied to other farmers, and in accordance with the regulations referred

to in the contract. USDA also had a duty of good faith and fair dealing, requiring no abuse of discretion and abiding by the legitimate expectations of the parties.

66. USDA's NRCS imposed wrongful Conservation Plan standards, and wrongly found the Bruhns non-compliant with the standards. The government's conservation non-compliance determination was claimed as a Bruhn contract breach purportedly justifying USDA withholding farm program benefits. But no Bruhn breach occurred.

67. The Bruhns complied, at all times, with their contract obligations.

68. USDA's benefit denial and discriminatory conservation non-compliance determination were a material contract breach. Despite NAD determining this fact, USDA has failed and refused to provide the benefits and pay the damages caused by their wrongful contract breach.

69. As a result, Mr. Bruhn has suffered these damages:

69.1. Loan deficiency program payments.

69.2. Inability to seal soybeans causing direct, incidental and consequential losses.

69.3. Direct and counter-cyclical payments.

69.4. Attorneys fees.

69.5. Expert witness fees.

69.6. Interest.

69.7. Lost marketing opportunities.

69.8. Increased interest rate.

69.9. Inability to purchase inputs at optimum prices at the beginning of the year due to lack of farm program revenue.

**Second Claim: Equal Protection**

70. Mr. Bruhn is a citizen of the United States and a farmer entitled to farm program benefits. His farms in the Loess Hills of western Iowa are managed in a conservation and erosion sense, better than other farms in the area.

71. Other farmers in the area with similar soil types, similar crops, similar slopes and similar landscapes were rightly conservation practice compliant by USDA. These similar fields utilized less than state-of-the-art conservation practices and exhibited gullying, ephemeral erosion, and lowland soil deposition than the Bruhn farms. The Bruhn land did not exhibit erosion.

72. Similarly situated farmers were not subjected to the arbitrary Super Sod Bust rules applied to the Bruhns. Neither were they subjected to an NRCS and FSA campaign to prevent the tillage of their land.

73. Alan and Calvin Bruhn were singled out arbitrarily, intentionally and discriminatorily by USDA. The persons doing so include all individual defendants. The Bruhns constitute a class of two persons treated wrongly by the Defendants.

74. USDA and its staff knew the Bruhns had a Fifth Amendment right to be free from arbitrary and discriminatory treatment.

75. Despite this knowledge, they carried out an intentional, reckless and unsupportable comprehensive scheme to halt the Bruhns tillage of the fields they began renting in 2000.

76. USDA's differential treatment occurred with no rational basis and with ill will, malice and wrongful intent directed at the Bruhns.

77. The actions of USDA constitutes a violation of Equal Protection Clause, *U S Constitution, Amend V*. As a result, Alan and Calvin Bruhn have suffered the damages already described.

**Third Claim: Fifth Amendment Due Process**

78. USDA and its agents decided to terminate the Bruhns' farm program benefits in 2004, and years prior, through establishing arbitrary, discriminatory and fictitious standards to set the Bruhns up for Conservation Plan non-compliance and Farm

Program benefit termination. This decision was made before any Conservation Compliance investigations or committee appeals.

79. Alan and Calvin Bruhn were not allowed a fair hearing at the county FSA Committee or the state FSA Committee level because USDA staff applied arbitrary, discriminatory and unsupportable standards, and because they previously consulted and decided they were not willing to objectively listen to, review and consider Alan and Calvin Bruhn's appeals.

80. This decision was made for reasons other than merit and were based upon a desire to see the Bruhn farm, or portions of it, removed from farm production.

81. Financial damage resulted in the manner previously described.

**Request for Relief**

82. Alan and Calvin Bruhn request $3 million damages, with the following items included:

82.1. Lost farm program benefits;

82.2. Direct, incidental and consequential damages for contract breach;

82.3. Lost marketing opportunities and profits;

82.4. Increased costs of doing business;

82.5. Costs, attorneys' fees and expert witness fees incurred in pursuing an appeal process made necessary by invalid Super Sod Bust standards.

82.6. Costs of this suit, attorneys fees and expert witness fees.

Alan and Calvin Bruhn, Plaintiffs

By ______ #31602

David A. Domina, NSBA #11043
DOMINALAW Group pc llo
2425 So. 144th St.
Omaha, NE 68144-3267
(402) 493-4100
fax: (402) 493-9782
email: dad@dominalaw.com
*Attorneys for Plaintiffs*

PREPARED DATE: 12/12/2003

his form is available electronically.

CCC-509 (10-01-03)

U.S.DEPARTMENT OF AGRICULTURE
Commodity Credit Corporation

# DIRECT AND COUNTER-CYCLICAL PROGRAM CONTRACT

1. PROGRAM YEAR 2004

2A. COUNTY OFFICE NAME AND ADDRESS (Include Zip Code)
MONONA COUNTY FSA OFFICE
PO BOX 118
ONAWA IA 51040-0118

NOTE: The authority for collecting the following information is Pub. L. 107-171. This authority allows for the collection of information without prior OMB approval mandated by the Paperwork Reduction Act of 1995. The time required to complete this information collection is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

2B. COUNTY OFFICE TELEPHONE NUMBER (Include Area Code)
(712)423-1311

| 3. STATE CODE | 4. COUNTY CODE | 5. FARM NUMBER |
|---|---|---|
| 19 | 133 | 230 |

The following statement is made in accordance with the Privacy Act of 1974 (5 USC 552a). The authority for requesting the following information is the Farm Security and Rural Investment Act of 2002, (Pub. L. 107-171). The information will be used to determine eligibility for program benefits. Furnishing the requested information is voluntary. Failure to furnish the requested information will result in denial of program benefits. This information may be provided to other agencies, IRS, Department of Justice, or other State and Federal Law enforcement agencies, and in response to a court magistrate or administrative tribunal. The provisions of criminal and civil fraud statutes, including 18 USC 286, 287, 371, 641, 651, 1001; 15 USC 714m; and 31 USC 3729, may be applicable to the information provided.

THIS CONTRACT TO PARTICIPATE is entered into between the Commodity Credit Corporation (CCC) and the undersigned producers on the farm identified above for the commodities identified in Item 6. The terms and conditions of the direct and counter-cyclical program contract are contained in the CCC-509 Appendix (10-01-03), entitled "Appendix to Form CCC-509 (10-01-03), Direct and Counter-Cyclical Program Contract." By signing this contract, the undersigned producers on the farm identified in Item 5 are participating in the Direct and Counter-Cyclical Program for the commodities identified in Item 6. By signing this contract, producers: (1) acknowledge receipt of the CCC-509 Appendix (10-01-03), and agree to abide by the terms contained therein, and (2) agree to comply with the regulations governing the applicable program and payment eligibility and limitation provisions; and certify to the accuracy of the information set out on this form.

| 6. Commodity | 7. Base Acres | 8. Maximum Payment Acres 85% of Base | 9. Payment Yield A. Direct | 9. Payment Yield B. Counter-Cyclical | 6. Commodity | 7. Base Acres | 8. Maximum Payment Acres 85% of Base | 9. Payment Yield A. Direct | 9. Payment Yield B. Counter-Cyclical |
|---|---|---|---|---|---|---|---|---|---|
| CORN | 80.2 | 68.2 | 92 | 92 | SOYBN | 31.0 | 26.4 | 37 | 37 |
| | | | | | | | | | |
| | | | | | | | | | |

10. Owner or Producer's Name and Address (Including Zip Code)

CALVIN BRUHN
14535 WALNUT AVE
MAPLETON IA 51034-7155

Identification Number: 9518

| 11. Commodity | 12. Payment Share | 11. Commodity | 12. Payment Share |
|---|---|---|---|
| CORN | .3000 | SOYBN | .3000 |
| | | | |
| | | | |

13A. If ALL Direct and Counter-Cyclical Payments are refused, check below.
___

13B. Producer's Initials

13C. Date Initialed (MM-DD-YYYY)

14. Advance Payment Selections (for all commodities):

A. Advance Direct Payments 01/2004 (Month requested for receipt of Direct Payment.)

B. Advance Counter-Cyclical Payments:
- First Partial Payment YES X NO ___
- Second Partial Payment YES X NO ___

15A. SIGNATURE OF OWNER OR PRODUCER

By [signature]

15B. DATE (MM-DD-YYYY)

12-16-03

EXHIBIT
1

CC-509 (10-01-03) Page 2 PREPARED DATE: 12/12/2003

PROGRAM YEAR 2004 | 3. STATE CODE 19 | 4. COUNTY CODE 133 | 5. FARM NUMBER 230

CONTINUATION OF OWNERS OR PRODUCER'S CROP INFORMATION (From Page 1)

| 10. Owner or Producer's Name and Address (Including Zip Code) | 11. Commodity | 12. Payment Share | 11. Commodity | 12. Payment Share |
|---|---|---|---|---|
| SHERYL RENEA BRUHN<br>14535 WALNUT AVE<br>MAPLETON IA 51034-7155<br><br>Identification Number: 5135 | CORN | .3500 | SOYBN | .3500 |

13A. If ALL Direct and Counter-Cyclical Payments are refused, check below. ___

13B. Producer's Initials | 13C. Date Initialed (MM-DD-YYYY)

14. Advance Payment Selections (for all commodities):
A. Advance Direct Payments 01/2004 (Month requested for receipt of Direct Payment.)
B. Advance Counter-Cyclical Payments:
- First Partial Payment YES X NO ___
- Second Partial Payment YES X NO ___

15A. SIGNATURE OF OWNER OR PRODUCER: by Alan Bruhn

15B. DATE (MM-DD-YYYY): 12-16-03

| 10. Owner or Producer's Name and Address (Including Zip Code) | 11. Commodity | 12. Payment Share | 11. Commodity | 12. Payment Share |
|---|---|---|---|---|
| ALAN DALE BRUHN<br>14535 WALNUT AVE<br>MAPLETON IA 51034-7155<br><br>Identification Number: 8520 | CORN | .3500 | SOYBN | .3500 |

13A. If ALL Direct and Counter-Cyclical Payments are refused, check below. ___

13B. Producer's Initials | 13C. Date Initialed (MM-DD-YYYY)

14. Advance Payment Selections (for all commodities):
A. Advance Direct Payments 01/2004 (Month requested for receipt of Direct Payment.)
B. Advance Counter-Cyclical Payments:
- First Partial Payment YES X NO ___
- Second Partial Payment YES X NO ___

15A. SIGNATURE OF OWNER OR PRODUCER: Alan Bruhn

15B. DATE (MM-DD-YYYY): 12-16-03

| 10. Owner or Producer's Name and Address (Including Zip Code) | 11. Commodity | 12. Payment Share | 11. Commodity | 12. Payment Share |
|---|---|---|---|---|
| C C BRYAN<br>7848 RIDGEVIEW DR NW<br>ALBUQUERQUE NM 87120-2881<br><br>Identification Number: 3091 | ************** Shares for all crops are zero ****************** | | | |

13A. If ALL Direct and Counter-Cyclical Payments are refused, check below. ___

13B. Producer's Initials | 13C. Date Initialed (MM-DD-YYYY)

14. Advance Payment Selections (for all commodities):
A. Advance Direct Payments 00/0000 (Month requested for receipt of Direct Payment.)
B. Advance Counter-Cyclical Payments:
- First Partial Payment YES ___ NO X
- Second Partial Payment YES ___ NO X

15A. SIGNATURE OF OWNER OR PRODUCER: SAQ

15B. DATE (MM-DD-YYYY)

CCC-509 (10-01-03) Page 2 PREPARED DATE: 12/12/2003

1. PROGRAM YEAR 2004 | 3. STATE CODE 19 | 4. COUNTY CODE 133 | 5. FARM NUMBER 230

## CONTINUATION OF OWNERS OR PRODUCER'S CROP INFORMATION (From Page 1)

10. Owner or Producer's Name and Address (Including Zip Code)

SHERYL RENEA BRUHN
14535 WALNUT AVE
MAPLETON IA 51034-7155

Identification Number: 5135

| 11. Commodity | 12. Payment Share | 11. Commodity | 12. Payment Share |
|---|---|---|---|
| CORN | .3500 | SOYBN | .3500 |

13A. If ALL Direct and Counter-Cyclical Payments are refused, check below. ___

13B. Producer's Initials | 13C. Date Initialed (MM-DD-YYYY)

14. Advance Payment Selections (for all commodities):
A. Advance Direct Payments 01/2004 (Month requested for receipt of Direct Payment.)
B. Advance Counter-Cyclical Payments:
- First Partial Payment YES X NO ___
- Second Partial Payment YES X NO ___

15A. SIGNATURE OF OWNER OR PRODUCER by Alan Bruhn

15B. DATE (MM-DD-YYYY) 12-16-03

10. Owner or Producer's Name and Address (Including Zip Code)

ALAN DALE BRUHN
14535 WALNUT AVE
MAPLETON IA 51034-7155

Identification Number: 8520

| 11. Commodity | 12. Payment Share | 11. Commodity | 12. Payment Share |
|---|---|---|---|
| CORN | .3500 | SOYBN | .3500 |

13A. If ALL Direct and Counter-Cyclical Payments are refused, check below. ___

13B. Producer's Initials | 13C. Date Initialed (MM-DD-YYYY)

14. Advance Payment Selections (for all commodities):
A. Advance Direct Payments 01/2004 (Month requested for receipt of Direct Payment.)
B. Advance Counter-Cyclical Payments:
- First Partial Payment YES X NO ___
- Second Partial Payment YES X NO ___

15A. SIGNATURE OF OWNER OR PRODUCER Alan Bruhn

15B. DATE (MM-DD-YYYY) 12-16-03

10. Owner or Producer's Name and Address (Including Zip Code)

C C BRYAN
7848 RIDGEVIEW DR NW
ALBUQUERQUE NM 87120-2881

Identification Number: 3091

| 11. Commodity | 12. Payment Share | 11. Commodity | 12. Payment Share |
|---|---|---|---|
| ************** Shares for all crops are zero ****************** | | | |

13A. If ALL Direct and Counter-Cyclical Payments are refused, check below. ___

13B. Producer's Initials | 13C. Date Initialed (MM-DD-YYYY)

14. Advance Payment Selections (for all commodities):
A. Advance Direct Payments 00/0000 (Month requested for receipt of Direct Payment.)
B. Advance Counter-Cyclical Payments:
- First Partial Payment YES ___ NO X
- Second Partial Payment YES ___ NO X

15A. SIGNATURE OF OWNER OR PRODUCER X Cheryl C Bryan

15B. DATE (MM-DD-YYYY) 12/27/03

CCC-509 (10-01-03) Page 3 PREPARED DATE: 12/12/2003

| 1. PROGRAM YEAR 2004 | 3. STATE CODE 19 | 4. COUNTY CODE 133 | 5. FARM NUMBER 230 |
|---|---|---|---|

CONTINUATION OF OWNERS OR PRODUCER'S CROP INFORMATION (From Page 1)

FOR FSA USE ONLY

| 16A. SIGNATURE OF CCC REPRESENTATIVE | 16B. DATE (MM-DD-YYYY) |
|---|---|
| X Susan Boddy | 1-02-2004 |

17. REMARKS

'he U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, iational origin, gender, religion, age, disability, political beliefs, sexual orientation, and marital or family status. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means for communication of program nformation (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD). To file i complaint of discrimination, write USDA, Director, Office of Civil Rights, Room 326-W, Whitten Building, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410 or call (202) 720-5964 (voice or TDD). USDA is an equal opportunity provider and employer.

IOWA
MONONA

U.S. Department of Agriculture
Farm Service Agency
2004 CCC-509B Worksheet

Prepared: 12-12-2003
Time: 12:50
Page: 1

Farm Number: 230
Operator: CALVIN BRUHN

| Crop | Base Acres | Payment Acres | Direct Yield | Counter Cyclical Yield | Direct Annual Payment |
|---|---|---|---|---|---|
| CORN | 80.2 | 68.2 | 92 | 92 | $1,757 |
| SOYBN | 31.0 | 26.4 | 37 | 37 | $430 |
| Total Projected Annual Payment | | | | | $2,187 |

ISCLAIMER:

he direct payment amounts reflected on this statement are based on 2004 payment rates.
he amounts may vary due to changes in payment acres, payment yields, producer eligibility, or producer shares.

he distribution of the form does not in any way obligate CCC to disburse the payment amounts reflected.

09E

UNITED STATES DEPARTMENT OF AGRICULTURE
FARM SERVICE AGENCY

DIRECT PAYMENTS
STATEMENT OF PRODUCER EARNINGS
Fiscal Year - 2004

IOWA
MONONA
Farm Number: 230
Payment Cycle: A

;8-5135 S
'L RENEA BRUHN
5 WALNUT AVE
ETON, IA. 51034-7155

ract/Producer Information: Approved CCC-509: N Combined Producer: N Multi-County Producer: Y Cert. FSA-578: N
Crop Payment Limitation Allocation: $35,147 Peanut Payment Limitation Allocation: $40,000

| | CORN | SOYBN |
|---|---|---|
| ent Acres | 68.2 | 26.4 |
| Reduction Acres | .0 | .0 |
| Payment Acres | 68.2 | 26.4 |
| ent Yield | 92 | 37 |
| ucer Share | 0.3500 | 0.3500 |
| iitted/AGI Share | 1.0000 | 1.0000 |
| iland Factor | 1.0000 | 1.0000 |
| ient Rate | 0.14000000 | 0.22000000 |
| :ulated Payment | $307 | $75 |
| nents Issued | | |
| eivables Established | | |
| r/Under Payment | $307 | $75 |

ISCLAIMER:

he direct payment amounts reflected on this statement are based on 2004 payment rates.
he amounts may vary due to changes in payment acres, payment yields, producer eligibility, or producer shares.

he distribution of the form does not in any way obligate CCC to disburse the payment amounts reflected.

OTE: Payment amounts are calculated by multiplying payment acres, payment yield, share, permitted/AGI share, cropland factor and the payment rate. Background information can be obtained from any FSA county office.

509E

UNITED STATES DEPARTMENT OF AGRICULTURE
FARM SERVICE AGENCY

DIRECT PAYMENTS
STATEMENT OF PRODUCER EARNINGS
Fiscal Year - 2004

IOWA
MONONA
Farm Number: 230
Payment Cycle: A

06-9518 S
'IN BRUHN
5 WALNUT AVE
,ETON, IA. 51034-7155

:ract/Producer Information: Approved CCC-509: N Combined Producer: N Multi-County Producer: Y Cert. FSA-578: N
Crop Payment Limitation Allocation: $20,000 Peanut Payment Limitation Allocation: $20,000

| | CORN | SOYBN |
|---|---|---|
| ıent Acres | 68.2 | 26.4 |
| Reduction Acres | .0 | .0 |
| Payment Acres | 68.2 | 26.4 |
| nent Yield | 92 | 37 |
| ducer Share | 0.3000 | 0.3000 |
| nitted/AGI Share | 1.0000 | 1.0000 |
| pland Factor | 1.0000 | 1.0000 |
| ment Rate | 0.14000000 | 0.22000000 |
| culated Payment | $264 | $64 |
| 'ments Issued | | |
| :eivables Established | | |
| ›r/Under Payment | $264 | $64 |

ISCLAIMER:

ıe direct payment amounts reflected on this statement are based on 2004 payment rates.
ıe amounts may vary due to changes in payment acres, payment yields, producer eligibility, or producer shares.

ıe distribution of the form does not in any way obligate CCC to disburse the payment amounts reflected.

OTE: Payment amounts are calculated by multiplying payment acres, payment yield, share, permitted/AGI share, cropland factor and the payment rate. Background information can be obtained from any FSA county office.

·509E

UNITED STATES DEPARTMENT OF AGRICULTURE
FARM SERVICE AGENCY

DIRECT PAYMENTS
STATEMENT OF PRODUCER EARNINGS
Fiscal Year - 2004

IOWA
MONONA
Farm Number: 230
Payment Cycle: A

-82-8520 S
N DALE BRUHN
35 WALNUT AVE
LETON, IA. 51034-7155

tract/Producer Information: Approved CCC-509: N Combined Producer: N Multi-County Producer: Y Cert. FSA-578: N
Crop Payment Limitation Allocation: $35,147 Peanut Payment Limitation Allocation: $40,000

| | CORN | SOYBN |
|---|---|---|
| ment Acres | 68.2 | 26.4 |
| Reduction Acres | .0 | .0 |
| Payment Acres | 68.2 | 26.4 |
| ment Yield | 92 | 37 |
| ducer Share | 0.3500 | 0.3500 |
| mitted/AGI Share | 1.0000 | 1.0000 |
| pland Factor | 1.0000 | 1.0000 |
| ment Rate | 0.14000000 | 0.22000000 |
| lculated Payment | $307 | $75 |
| yments Issued | | |
| ceivables Established | | |
| er/Under Payment | $307 | $75 |

ISCLAIMER:

he direct payment amounts reflected on this statement are based on 2004 payment rates.
he amounts may vary due to changes in payment acres, payment yields, producer eligibility, or producer shares.

he distribution of the form does not in any way obligate CCC to disburse the payment amounts reflected.

OTE: Payment amounts are calculated by multiplying payment acres, payment yield, share, permitted/AGI share, cropland factor and the payment rate. Background information can be obtained from any FSA county office.

**This form is available electronically.** *See Page 7 for Privacy Act Statement.*

**CCC-509 Appendix**
(07-22-04)

U.S. DEPARTMENT OF AGRICULTURE
Commodity Credit Corporation

# APPENDIX TO FORM CCC-509, DIRECT and COUNTER-CYCLICAL PROGRAM CONTRACT

NOTE: The authority for collecting the following information is Pub. L. 107-171. This authority allows for the collection of information without prior OMB approval mandated by the Paperwork Reduction Act of 1995. The time required to complete this information collection is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

## 1 PURPOSE

This Appendix sets forth additional terms and conditions of the Direct and Counter-Cyclical Program Contract (CCC-509). A producer who signs the Direct and Counter-Cyclical Program Contract agrees to follow the terms and conditions contained in this CCC-509 Appendix, and acknowledges the applicability of any provisions of the federal regulations applicable to the contract including those found at 7 CFR Parts 12, 718, 1400, 1405, and 1412.

## 2 DEFINITIONS

A **Producer** means an owner, operator, landlord, tenant, or sharecropper who *shares in the risk of producing a crop* and is *entitled to share in crop available for marketing* from the farm, or would have shared had the crop been produced. In determining whether a grower using hybrid seed, under contract, to produce a covered commodity or peanuts is eligible for a program payment to which contract applies, the CCC shall ignore the contract with the seed producer and allow the payment to the grower of the crop produced from the seed. The preceding sentence shall only apply, however, if the grower of the crop produced from the seed would, but for the contract, be eligible to be considered a producer of the crop.

B **Base Acres** means the number of acres for the covered commodity on the farm specified on the contract (CCC-509). Base acres may be increased if a Conservation Reserve Program contract applicable to the farm expires or is voluntarily terminated. The adjustment in the base acres of a crop, if any, will be determined by the Secretary of Agriculture.

C **Covered Commodity** means wheat; corn; grain sorghum; barley; oats; upland cotton; sesame; soybeans; canola; crambe; flax; mustard; rapeseed; safflower; sunflowers; or other oilseeds, if any, as determined by the Secretary of Agriculture; and rice. In addition, for purposes of this Appendix for the Contract (CCC-509), peanuts shall be considered to be a "covered commodity."

D **Dry Peas** means Austrian, wrinkled seed, yellow, Umatilla, and green, excluding peas grown for the fresh, canning, or frozen markets.

E **All words and phrases** have the meanings assigned to them in the regulations found at 7 CFR Parts 718, 1400, and 1412.

## 3 CONTRACT

By signing CCC-509 the owners and producers on a farm understand and agree that:

A Only a "producer", as defined in item 2A of this appendix, is entitled to earn direct or counter-cyclical payments. The payment shares for each commodity, as identified on CCC-509, must be representative of each producer's interest in base acres based on farming practices in the area to the satisfaction of the County FSA Committee.

B The payment shares for a producer may not exceed the producer's applicable interest in base acres;

C The CCC-509 becomes effective when signed by an authorized representative of CCC; however, the contract period is from October 1 through September 30 of the applicable fiscal year represented by the CCC-509. Accordingly, producers signing CCC-509 are representing compliance with the terms and conditions of the CCC-509 Appendix and federal regulations for the entire contract period;

D At any time prior to September 30 of the crop year covered by this contract, the contract may be terminated upon written agreement of all producers receiving payment under the contract and, if applicable, each producer shall repay advance direct payments received for the crop year, plus interest;

E The payments, with respect to the base acres shall be terminated for a producer or owner whose interest in the crops or land on the farm is transferred, in which case each applicable producer shall repay payments received for the crop year and shall not be entitled to earn direct payments or counter-cyclical payments with respect to the farm. The transferee may assume the obligation of the contract if the transferee is otherwise eligible to participate in the program by entering into a revised contract during the period of time prescribed by CCC. In the event a succession-in-interest occurs and the contract obligation is not assumed timely for the crop year, all producers on the contract shall refund to CCC payments received for the crop year in which the succession occurred, plus interest;

F Changes in the farming operation that may affect any determination after the Direct and Counter-Cyclical Program contract is signed, including, but not limited to, ownership changes, producer changes, or changes in the crop share arrangements on the farm, shall be reported to CCC by all applicable producers signing a revised CCC-509 to reflect the change no later than September 30 of the contract period. The failure of producers to timely report changes and file a revised CCC-509 may result in the loss of payments for all producers on the farm for the crop year covered by the contract. In such event, all producers on the contract shall refund to CCC payments received for the crop year, plus interest;

G A completed farm reconstitution to divide or combine farms shall result in the termination of the contract and, with respect to the base acreage assigned by the Secretary to the resulting farms of a reconstitution, the farm producers may enroll the base acres for a crop year by signing a new Direct and Counter-Cyclical Program Contract (CCC-509) for the resulting farm, by the later of June 1 or 30 days after notification of the bases and yields of the resulting farm. Producers and owners may sign CCC-509 between June 2 and September 30 of the contract period, provided that a user fee of $100.00 for the farm is paid to CCC; however, the user fee is waived if the reconstitution is requested by June 1 and all signatures are obtained within 30 days following the written notification that the farm reconstitution has been completed. The failure of producers and owners to timely enroll the base acres may result in the loss of payments for all producers on the original or new farm for the crop year;

H Producers will timely file in the manner prescribed by CCC with the County Committee the following, and agree to meet any other certification or filing requirements, as may be required by CCC:

(1) A certification of the acreage of all cropland on the farm in accordance with 7 CFR Part 718;

(2) A farm operating plan in accordance with 7 CFR Part 1400; and

(3) A certification of compliance with the highly erodible land and wetland conservation provisions set forth in 7 CFR Part 12;

I Violations of the highly erodible land and wetland conservation provisions of 7 CFR Part 12 may result, at CCC's discretion, in termination of the payments with respect to each producer in violation or a reduction in the contract payment. Upon termination, each producer shall forfeit all rights to receive contract payments on each farm in which the producer has an interest and shall refund to CCC all contract payments received by such producer during the period of violation, plus interest;

J The provisions of 7 CFR Part 1400 relating to "per person" payment limits and payment eligibility requirements are applicable to this contract. Each producer determined by CCC to have adopted a scheme or device designed to evade, or which has the effect of evading such regulations, must refund any contract payment, marketing loan gain, or loan deficiency payment and any other applicable payment received on all farms in which such producer has an interest and shall be ineligible for such payments for the following fiscal year;

K The regulations at 7 CFR Parts 12, 718, 1400, 1405, and 1412 are incorporated by reference as part of this contract;

L Representatives of CCC may enter the farm to determine if the producers are in compliance with this contract; and

M The base acres must be devoted to an agricultural or related use

N Payments are subject to the availability of funds and to limits on payments as may be provided for in the program regulations.

O Calculations provided for in this Appendix shall be made by farm, as provided for in the program contract (Form CCC-509) and each farm must have a separate CCC-509 on file for any farm from which a producer wants to generate payments. All payments are subject to the availability of funds and compliance with all applicable laws and regulations. A separate CCC-509 is required for each program year for each farm, from which a producer seeks to generate payment and calculations for each program year will be made separately. There may only be one CCC-509 from any farm from any program year – that is, all producers on the farm must for each program year, file a CCC-509.

4 **PLANTING FLEXIBILITY PROVISION**

A Producers may plant that part of their cropland in excess of the total base acres on the farm to any commodity for that part of the cropland equal to the eligible base, the producer shall be subject to the restrictions set out below. Base acres eligibility cannot exceed the amount provided for in the program regulations. That is, for the farm, the producer's total base acres on the farm for all covered commodities can never exceed the amount equal to the currently available cropland on the farm minus that amount of that cropland which is (1) in the Department's Conservation Reserve Program; or (2) enrolled in a conservation program for which payments are made in exchange for not producing an agricultural commodity on the acreage.

B The planting of fruits (including nuts), vegetables (other than lentils, mung beans, and dry peas) and wild rice on base acres on the farm is prohibited and shall result in a violation of the terms of this contract unless one of the following exceptions are met:

(1) The fruit (including nuts), vegetable or wild rice is planted in a double-cropping practice with a covered commodity or peanuts, as determined by the county committee, in any region designated by CCC at 7 CFR Part 1412 as having a history of double-cropping covered commodities or peanuts with fruits, vegetables or wild rice, in which case there is no contract violation or reduction in DCP payments;

(2) The fruit (including nuts), vegetable or wild rice is planted on a farm that has an established history of planting fruits, vegetables or wild rice, as determined by the county committee, in which case there is no contract violation; however, DCP payment acres shall be reduced by an acre for each acre of base acres planted to a fruit (including nuts), vegetable (other than lentils, mung beans, and dry peas) or wild rice; or

(3) The producer(s) with an interest in the specific fruit (including nuts), vegetable or wild rice planted has an established history of planting the specific fruit, vegetable or wild rice, and the plantings on base acres do not exceed the producer's average annual planting history for the specific fruit, vegetable or wild rice for either the 1991 through 1995 crop years or the 1998 through 2001 crop years, but not both, as selected by the producer, in which case there is no contract violation; however, DCP payment acres shall be reduced by an acre for each acre of base acreage planted to a fruit (including nuts), vegetable (other than lentils, mung beans, and dry peas) or wild rice. When calculating a producer's average annual planting history, all years in which the producer did not plant the specific fruit, vegetable or wild rice, as applicable, shall be excluded.

**C** Failure to comply with the fruit, vegetable and wild rice provisions of this section may result in the termination of the contract or a reduction in the DCP payments, at CCC's discretion.

**D** Producers shall protect base acreage from erosion and shall control weeds, including noxious weeds, on base acres.

**5 DIRECT PAYMENTS**

**A** The direct payment for each crop will be computed by multiplying: (1) 85 percent of the base acres, as identified in column 8 of Form CCC-509, by (2) the program payment yield in column 9.A of Form CCC-509, by (3) the payment rate for the applicable crop year as indicated on page 7 of this appendix, by (4) the producer's share of the crop as indicated in column 12 of Form CCC-509.

**B** CCC will make advance payments available to producers who request such an advance by multiplying the payment amount determined in paragraph A of this section by 50 percent. Such payments may be made in any month from December through September of the contract period.

**C** A producer must refund to CCC any payment which exceeds the amount actually earned under this contract, including the refund of unearned payments for a crop year resulting from another owner or producer assuming an interest in the base acres for the crop year. Interest on such refunds shall be assessed in accordance with 7 CFR Part 1403 and will accrue from the date of disbursement. In the event a succession-in-interest is timely reported on a revised CCC-509, interest on refunds from predecessors is not charged if such refund is made by September 30 of the contract period.

**D** A final payment for the crop year will be made to producers as soon as practicable after October 1 of the crop year in which the crop is normally harvested.

**6 COUNTER-CYCLICAL PAYMENTS**

**A** Counter-cyclical payments are authorized for a covered commodity when the effective price for the commodity is less than the target price of the commodity. The effective price for a covered commodity is equal to the sum of (1) the higher of the national average market price received by producers during the 12-month marketing year for the covered commodity, as determined by the Secretary, or the national average loan rate for the commodity, as found in 7 CFR Part 1412.503(b)(1)(ii) or (iii), as applicable, and (2) the direct payment rate for the covered commodity, as provided in 7 CFR Part 1412.502(d).

**B** By farm by producers the counter-cyclical payment, if any, for each crop will be computed by multiplying: (1) 85 percent of the base acres, as identified in column 8 of Form CCC-509, by (2) the program payment yield in column 9 B of Form CCC-509, by (3) the payment rate determined in item 6 C of this appendix, by (4) the producer's share of the crop as indicated on Form CCC-509.

C The counter-cyclical payment rate for a commodity, when authorized for a crop year, is determined by subtracting the effective price for the commodity from the target price of the commodity.

The direct payment rates, national loan rates, and maximum counter-cyclical payment rates for each of the 2004 through 2007 crop years are identified on page 7 of this appendix. Counter-cyclical payments are not calculated for base acres of canola, crambe, flax, mustard, rapeseed, safflower, sesame, or sunflowers, because the sum of the national loan rate and the direct payment rate for those covered commodities is equal to or greater than the target price. Payments for other eligible oilseeds, if any, shall be as determined by the Secretary.

D For any of the 2006 and preceding crop years to which this agreement applies, CCC may authorize partial counter-cyclical payments for a covered commodity, if before the end of the applicable 12-month marketing year for the commodity the Secretary estimates that counter-cyclical payments will be required. In this event, producers may request a first partial payment of no more than 35 percent, as determined by the Secretary, of the projected payment amount, to be made in October of the calendar year in which the crop is normally harvested. Producers may request a second partial payment of no more than 70 percent, as determined by the Secretary, of the projected payment amount (including any revision of earlier projections) less the amount of any first partial payment, if applicable, to be made after February 1 of the calendar year after the year in which the crop is normally harvested. With respect to the 2007 crop year, one partial payment of 40 percent of the projected payment amount may be authorized, to be made in October of 2007.

E A final counter-cyclical payment for the crop year, if applicable, will be made to producers as soon as practicable after the end of the 12-month marketing year for the applicable commodity.

F A producer must refund to CCC any payment which exceeds the amount actually earned under this contract, including the refund of any unearned partial counter-cyclical payment when actual market prices exceed the projected market prices used in determining the partial payment rates. CCC may, in its discretion, automatically reduce any partial, advance, or final direct payments or counter-cyclical payments earned by, or which would otherwise be received by, the producer (or affiliated person or entity as provided in 7 CFR Part 1403) in any current or future year to help satisfy any obligation to repay any unearned partial, advance, or final direct or counter-cyclical payment for the current year or any other year under this contract. Likewise, such other payments may be withheld in the case of partial or advance payments pending a determination of whether those payments would themselves be subject to a refund because of a recalculation made when final payments are due.

7 **OTHER PAYMENT PROVISIONS**

A Payment yields on CCC-509 that were established based on average production yields from 1998 through 2001 remain subject to adjustment until such time as the County FSA Committee has reviewed production records and determined the established yields are accurate. Subject to program regulations, the payment yields may be reduced for direct and counter-cyclical payments, for the current and future crop years, if the production records cannot be substantiated, and producers on the farm must refund any overpayments based on incorrect payment yields.

B A producer who refuses to receive direct and counter-cyclical payments by indicating such on CCC-509 may subsequently decide to receive payments, provided that the producer signs a revised CCC-509 or otherwise notifies the County FSA Committee in writing on or before September 30 of the contract period.

C Payments shall not be earned by any producer on a contract for a crop year, unless payment shares are properly designated and all producers sign the contract in accordance with 7 CFR Part 1412. In cases where a valid payment share dispute exists, direct and counter-cyclical payments shall not be earned by producers involved in the dispute on the farm unless the payment share to dispute is resolved by agreement of the parties and documented in writing to the satisfaction of the County FSA Committee on or before September 30 of the contract period, and the agreed upon payment shares are within program regulations and provisions.

D Any payment or portion thereof due any producer will be made by CCC without regard to any question of title under state law, and without regard to any claim or lien against the crop, or proceeds therefrom, which may be asserted by a creditor, except agencies of the U.S. Government. Offsets for debts owed to agencies of the U.S. Government shall be made prior to making any payments to producers or their assignees.

E Payments can be denied by any signatory who CCC determines has violated State law provisions that affect a tenant's right to lease agricultural land, or any person (including a subsequent tenant) who would profit by such a violation.

## 8 LOSS OF BENEFITS

A If CCC determines a producer erroneously represented any fact affecting a determination to be made by CCC under this contract, direct and counter-cyclical payments shall not be allowed on the farm with respect to the payment shares of that producer. If CCC determines that the misrepresentation was intentional or fraudulent, or if the producer knowingly adopted any scheme or device which tends to defeat the purposes of this contract, the producer shall forfeit all rights to contract payments on each farm in which the producer has an interest and shall refund to CCC all contract payments received by the producer during the period of the violation, plus interest.

B All producers sharing in the contract payments are jointly and severally liable for any refunds determined pursuant to paragraph A of this section and CCC will establish claims for the full amount of the refund against each producer in accordance with 7 CFR Part 1403. A signatory to the contract who does not receive any share of the contract payments shall not be liable for the repayment of such refund.

C The provisions of this section are in addition to any liability which may be incurred under various criminal and civil fraud statutes, including, but not limited to, 18 U.S.C. 286, 287, 371, 641, 1001; 15 U.S.C. 714m; and 31 U.S.C. 3729.

## 9 MODIFICATIONS

CCC reserves the right to correct all errors in entering data on Form CCC-509 and the results of computations made pursuant thereto. CCC also reserves the right to require refunds of payments as the result of determinations made in accordance with the maximum payment limitations of 7 CFR Part 1400.

## 10 PAYMENT RATE INFORMATION

| Direct Payments and Maximum Counter-Cyclical Rates for Covered Commodities and Peanuts, Crop Years 2004-2007 | | | | | | |
|---|---|---|---|---|---|---|
| **Commodity** | **Units** | **Target Price** | **Direct Payment Rate** | **Loan Rate** | **Minimum Effective Price** | **Maximum Counter-Cyclical Payment Rate** |
| **Wheat** | $/bu. | 3.92 | **0.52** | 2.75 | 3.27 | **0.65** |
| **Corn** | $/bu. | 2.63 | **0.28** | 1.95 | 2.23 | **0.40** |
| **Grain Sorghum** | $/bu. | 2.57 | **0.35** | 1.95 | 2.30 | **0.27** |
| **Barley** | $/bu. | 2.24 | **0.24** | 1.85 | 2.09 | **0.15** |
| **Oats** | $/bu. | 1.440 | **0.024** | 1.330 | 1.354 | **0.086** |
| **Upland Cotton** | $/lb. | 0.7240 | **0.0667** | 0.5200 | 0.5867 | **0.1373** |
| **Rice** | $/cwt. | 10.50 | **2.35** | 6.50 | 8.85 | **1.65** |
| **Soybeans** | $/bu. | 5.80 | **0.44** | 5.00 | 5.44 | **0.36** |
| **Other Oilseeds** | $/lb. | 0.1010 | **0.0080** | 0.0930 | 0.1010 | **0.00** |
| **Peanuts** | $/ton | 495.00 | **36.00** | 355.00 | 391.00 | **104.00** |

**NOTE:** *The following statement is made in accordance with the Privacy Act of 1974 (5 USC 552a). The authority for requesting the following information is the Farm Security and Rural Investment Act of 2002, (Pub. L. 107-171). The information will be used to determine eligibility for program benefits. Furnishing the requested information is voluntary. Failure to furnish the requested information will result in denial of program benefits. This information may be provided to other agencies, IRS, Department of Justice, or other State and Federal Law enforcement agencies, and in response to a court magistrate or administrative tribunal. The provisions of criminal and civil fraud statutes, including 18 USC 286, 287, 371, 641, 651, 1001; 15 USC 714m; and 31 USC 3729, may be applicable to the information provided.*

*The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, gender, religion, age, disability, political beliefs, sexual orientation, and marital or family status. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at (202) 720-2600 (voice and TDD). To file a complaint of discrimination, write USDA, Director, Office of Civil Rights, Room 326-W, Whitten Building, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410 or call (202) 720-5964 (voice or TDD). USDA is an equal opportunity provider and employer.*